IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2023

## IN RE DANIELLE V., ET AL.

**Appeal from the Circuit Court for Gibson County**
**No. 9174     Clayburn Peeples, Judge**

**No. W2023-01023-COA-R3-PT**

This appeal concerns termination of parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Circuit Court for Gibson County ("the Trial Court") seeking to terminate the parental rights of Kristie C. ("Mother"), Jose O. ("Father"), Jose H., and Giovani C. to the minor children D.V., G.V., J.C., H.V., K.O., A.V., C.O., and R.V. ("the Children," collectively).[1] After a hearing, the Trial Court entered an order terminating Mother's and Father's parental rights to the Children based on the ground of severe child abuse. The Trial Court found further that termination of Mother's and Father's parental rights is in the Children's best interest. Mother and Father appeal. While conceding the ground of severe child abuse, they argue that the Trial Court erred in its best interest analysis, which they say was inadequate. We find, as did the Trial Court, that the ground of severe child abuse was proven against Mother and Father by clear and convincing evidence. In addition, we find that the Trial Court's findings of fact were sufficient to underpin its best interest analysis, and that the evidence is clear and convincing that termination of Mother's and Father's parental rights is in the Children's best interest. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CARMA DENNIS MCGEE and JEFFREY USMAN, JJ., joined.

---

[1] Mother is the mother of all eight of the Children. Father is the father of K.O., A.V., C.O., and R.V. Father also is the alleged father of H.V. Although there are multiple fathers at issue, we refer to Mr. O. as Father for convenience since he is the only father to have appealed. Jose H. is the alleged father of D.V. Giovani C. is the legal father of J.C. and the alleged father of G.V. Jose H.'s and Giovani C.'s parental rights were terminated and these men have not appealed. This appeal concerns only Mother's and Father's parental rights to the Children.

Becky Dykes Bartell, Dyersburg, Tennessee, for the appellant, Kristie C.

Alexander D. Camp, Jackson, Tennessee, for the appellant, Jose O.

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

**OPINION**

## Background

In May 2020, DCS received a referral about drug exposure and environmental neglect in Mother and Father's home. DCS went to the home and found it filthy. Mother, Father, and five of the Children tested positive for methamphetamine. Four of the Children who tested positive—C.O., R.V., K.O., and A.V.—were under the age of eight.[2] DCS visited the home a week later and Mother tested negative. She reported that Father had used methamphetamine several months earlier and used marijuana on a daily basis. Mother refused to leave Father, but she agreed to work services. However, Mother and Father failed to appear at a June 2020 child and family team meeting. Mother was incarcerated as a result of a shoplifting charge. DCS petitioned for temporary custody of the Children; for the Children to be adjudicated dependent and neglected; and for a finding that those of the Children who tested positive for methamphetamine were severely abused. In June 2020, the Juvenile Court for Gibson County ("the Juvenile Court") entered a protective custody order placing the Children in DCS custody. In September 2020, the Juvenile Court entered an order adjudicating the Children dependent and neglected. The Juvenile Court also found that C.O., R.V., K.O., and A.V. were severely abused by Mother and Father, pursuant to Tenn. Code Ann. § 37-1-102(b)(27)(E). Neither parent appealed this finding. Mother later pled guilty to four counts of attempted aggravated child endangerment. Meanwhile, the Children were placed in potential adoptive homes. Mother and Father began to work services and visit the Children. On April 13, 2022, DCS filed a petition in the Trial Court seeking to terminate Mother's and Father's parental rights to the Children.

In April 2023, the Trial Court heard DCS's petition. First to testify was Brittany Haynes ("Haynes"), the Children's DCS case manager. The Children had been in DCS custody continuously since June 1, 2020. They were all in potential adoptive homes by the time of trial. Mother and Father both signed the criteria and procedure for termination of parental rights. Asked what services she had provided Mother, Haynes stated that she gave Mother resources on getting a mental health intake done as well as an A&D assessment.

---

[2] D.V. was born in April 2008; G.V. in January 2011; J.C. in March 2012; H.V. in March 2014; K.O. in January 2015; A.V. in July 2016; C.O. in June 2017; and R.V. in August 2018.

An A&D assessment for Mother subsequently was provided. Mother also completed a parenting assessment. Mother participated in family support services and supervised visitation. Regarding Father, Haynes replied that he had participated in family support services, supervised visitation, an alcohol and drug assessment, and a parenting assessment. However, Haynes testified that neither Mother nor Father completed their services. Haynes elaborated that while Mother and Father sometimes were compliant, they had not maintained and followed through on recommendations. For one thing, according to Haynes, Mother and Father had not exhibited the necessary parenting skills. There were times when the parents could not properly supervise all eight of the Children.

As for drug abuse, Haynes said that Mother had been dismissed from in-patient drug treatment for not following the rules. Over the course of the case, Mother had passed some drug tests and failed others. Mother initially failed for methamphetamine. A second failed test was for cocaine and another was for methamphetamine. About two months before trial, Mother tested negative. Mother was participating in alcohol and drug counseling at that time. Before that, in January 2022, Mother tested positive for methamphetamine and cocaine. Mother told Haynes that she had relapsed then. With respect to Father, Haynes stated that he had a negative drug test two months before trial. Before that, in January 2022, Father tested positive for methamphetamine and cocaine. Mother and Father were residing together at that time. Haynes had been to Mother and Father's most recent home, although not recently. They disclosed to Haynes that someone who used illegal drugs was living with them.

Regarding the quality of the parents' supervised visits with the Children, Haynes stated that there were issues with discipline and that the Children were not shown equal attention. Mother and Father never progressed to unsupervised visitation. Haynes testified that she had not seen anything that would show that the parents had made changes to their conduct or circumstances that would make it safe for the Children to be returned to them. Mother faced the possibility of being incarcerated again because of her being discharged from the halfway house. Haynes said that Mother had multiple jobs over the course of the case. Haynes also said that there were concerns about domestic violence between the parents. Regarding Father, Haynes said that he had not been the primary caretaker of the Children. Haynes said that Father was passing drug screens but that there were concerns about his alcohol use, as well. Haynes stated that Father had not been consistent with passing drug screens until it was brought up in a criminal matter.

With respect to the parents' relationship with the Children, Haynes testified that Mother has a relationship with her oldest daughter, but that it is akin to a friendship. There was not a strong relationship between Mother and the rest of the Children. According to Haynes, Father has a bond with some of his children, but not a strong bond. Haynes stated

that the two youngest of the Children, who are two of Father's biological children, consider their foster parents mom and dad.

On cross-examination by Mother's counsel, Haynes acknowledged Mother's participation in certain services. Asked what Mother still needed to do to complete her alcohol and drug assessment, Haynes testified that "if she were to test positive for opiates or methamphetamine that she go inpatient. When she tested positive in January, she did not go inpatient. She then got incarcerated. She was allowed to go inpatient as part of her plea agreement and was unsuccessfully discharged in less than 2 weeks." Mother was incarcerated from January through July of 2022. Since January 2022, Mother had either been incarcerated or in some type of treatment program. Regarding visitation, the parents visited the Children twice a month for two hours at a time. Haynes acknowledged that Mother regularly visited the Children. Asked about Mother's criminal past, Haynes testified that Mother has a long history of incurring criminal charges. Haynes stated that Mother's case was a "continuous cycle of things get on track, they are doing better, and then they relapse."

Under cross-examination from Father's counsel, Haynes acknowledged that Father had successfully completed an A&D evaluation. However, after this was completed, Father had a positive hair follicle test result. Haynes stated that, apart from the initial drug test that initiated this case with the removal of the Children, the January 2022 test was Father's only other failed drug test in the case. Asked if Father had missed any visits, Haynes said that he missed at least one for having been arrested for domestic violence and vandalism against Mother. Haynes testified to concerns about Father's supervision of the Children. One of Father's children has cerebral palsy and wears braces on his leg. One time, Father let him "go the wrong way" on top of a jungle gym, and the child almost fell off.

The Guardian ad Litem also asked questions of Haynes. Asked about the Children's demeanors after visits from their parents, Haynes said that some of the Children had "accidents" on themselves, behavioral issues, or were sad. The Children have undergone counseling. Haynes was then asked what criminal charges Mother and Father had incurred since June 2020. Haynes said that Mother has had a "few" shoplifting or theft charges since then. Mother also was incarcerated for violating her probation for shoplifting. Father had been charged with domestic violence and vandalism against Mother. He also had been charged with aggravated assault against Mother's father. Father incurred various other charges like disorderly conduct. Haynes did not know the status of Father's aggravated assault charge.

Mother testified next. Mother stated that when she got out of jail in July 2022, she went to live with her father. She said that she had not used drugs for almost a year. She

acknowledged having a history of methamphetamine and cocaine use. Mother and Father did these drugs together. In 2021, Mother was discharged from a program because she was still actively using. Asked if she had successfully completed any rehab programs since her January 2022 failed test, Mother said "[j]ust the IOP and OP at Alternative Choices." Mother was discharged unsuccessfully from another facility because she asked Father to come visit her. Mother was not supposed to have any visitors at that point.

Asked if she is still in a relationship with Father, Mother said "[k]inda/sorta but he was willing to separate if he got his kids." Mother agreed that there had been domestic violence in her relationship with Father while they were both under the influence of alcohol. Mother said that she drank once every three months or so. According to Mother, Father drinks once every four or five months, if he has not stopped altogether. When Mother lived with Father, he drank once or twice a week. Domestic incidents occurred between the two once or twice a month. Asked why she stayed there, Mother said: "I don't know. I just stayed there. I don't know why I did." Mother acknowledged having been dismissed from a program for having paid a light bill for Father, which was against the rules. Mother said that she had gotten into another rehab program as of the day of trial. Asked whether there had been much change in her situation over the custodial episode, Mother said "[j]ust within the last year."

On cross-examination, Mother said that she had trouble disciplining the Children on her visits, but that she had been working on that lately by putting the Children in time-out. Mother said that she was trying to spend time with each of the Children. Mother testified that she calls the Children regularly and attends visits.

Father testified last.[3] Father said that he last used methamphetamine in 2022. He said that he had been clean from alcohol and drugs for three months. Father had been in alcohol and drug treatment for over eight months. Father denied ever getting physical with Mother during an argument. Asked about an October 2022 guilty plea to drunk driving, Father denied it and suggested that it was his brother posing as him. Asked how long the Children had to wait for him to get his life in order, Father said that he was ready to have the Children returned to him now. On cross-examination, Father agreed that there was a need for state intervention early on, but that he has since adjusted his circumstances. Father said that Haynes could have given him more help. He said, for example, that he wanted more visitation time. Father also said that, in some phone calls, Haynes asked him to refrain from speaking in Spanish. Father said that communicating with his children in Spanish is a means of connecting with them. Father disagreed with Haynes' assessment that he showed the Children unequal attention. Father said that he never missed a visit. Father said that his eldest daughter tells him that he is her only father. In terms of a

---

[3] Father's primary language is Spanish. He testified at trial through an interpreter.

residence, Father said that he has a three-bedroom home with the option of building more rooms. Father works in construction. He said that his mental and physical health is "perfect."

In June 2023, the Trial Court entered its final order terminating Mother's and Father's parental rights to the Children. On the basis of the Juvenile Court's finding of severe child abuse, which never was appealed, the Trial Court found that DCS had proven the ground of severe child abuse against Mother and Father by clear and convincing evidence.[4] The Trial Court found further, also by clear and convincing evidence, that termination of Mother's and Father's parental rights is in the Children's best interest. In its termination order, the Trial Court found, as relevant:

> Upon their removal into the Department's custody, the children were placed in foster care where they have remained since June 1, 2020. The children have done well in foster care and have prospered in the stability they have found through foster care. [Mother] and [Father] have participated in visitation with the minor children throughout the case, with the exception of the time period when Mother was in jail and did not visit. Ms. Haynes testified that [Mother] and [Father] had issues during visitations with paying attention to all of the children and with spending time with all of the children equally. [Mother] and [Father] have not progressed to anything beyond supervised visitation since this case started in June of 2020.
> [Mother] was recently dismissed from her half-way house and testified that she would be enrolling in a new program the afternoon of April 25, 2023. [Mother] testified that it had been almost a year since she had used any illegal drugs, and that she has a history of methamphetamine and cocaine use. [Mother] testified that she and [Father] have a history of using these drugs together. [Mother] admitted that she had not completed any A&D counseling during the first year because she was still in active addiction, and that only in the last year has she begun to try to address her drug issues. [Father] testified that he last used methamphetamine in 2022, but that he has been sober for 3 months at the time of this hearing. [Father] testified that he has not completed any treatment for drugs and alcohol, but that he is currently going through treatment which he began about 8 months ago.
> [Mother] testified that she is residing with her father (only since Friday, April 21, 2023) since being dismissed from her half-way house, which she testified occurred due to her payment of a household bill for [Father]. [Father] resides in the home he and [Mother] moved to during this

---

[4] In his brief, Father says that the Trial Court found additional grounds against him. From our review of the record, the sole ground found against Father was severe child abuse.

case in . . . Tennessee; however, from the testimony of [Mother], she is sometimes helping him pay the bills in that home despite not residing there currently. [Mother] testified that there was domestic violence in the family home between her and [Father], and that it occurred when they were under the influence of alcohol. Despite this type of volatile relationship, both [Father] and [Mother] testified that they are still in a relationship with each other as of this time.

The children's needs are being met in their current foster homes, and they are not being exposed to drug use in their foster homes. Ms. Haynes testified that the children are all currently in potential adoptive placements, with the children placed across 4 foster homes. The children have sibling visitation time with each other as well as visits with their parents. The parents have not successfully or fully participated in any services with the Department. [Mother] and [Father] have not completed any alcohol and drug treatment program, though they both admit to having such issues. Based on [Mother] recently paying a household bill for [Father] despite such causing her dismissal from her own half-way house, there is some concern with the residential stability of [Father]. The children have lived outside of the custody of their parents for almost 3 years at the time of this hearing, and they are thriving with their foster families while the parents continue to languish in essentially the same situations they were in when the children were removed and placed in foster care.

***

[Severe Child Abuse]

***

By Order of the Gibson County Juvenile Court entered on September 9, 2020, [Mother] and [Father] were found to have committed severe child abuse pursuant to TCA § 37-1-102(b)(27)(E) as to the children, [C.O., R.V., A.V., and K.O.], as evidenced by document 6 in Collective Exhibit 1. [Mother] stipulated that she perpetrated this severe abuse, and after a hearing, [Father] was found by clear and convincing evidence to have perpetrated severe abuse. This order was never appealed by [Mother] or [Father]. Obviously, as far as [Mother] and [Father] this ground has been met.

***

[Best Interest]

-7-

***

The best interest determination is a fact-intensive analysis and involves consideration of the statutory factors listed in Tenn. Code Ann. § 36-1-113(i). This Court finds by clear and convincing evidence that it is in the children's best interest for [Mother's and Father's] . . . parental rights to be terminated.

We have 8 children here who have a critical need for stability and continuity in their lives, and a change of caretakers at this point in life would negatively affect these children. It appears to the Court that these children pretty much lived in chaos until they were taken away from [Mother] and [Father], who were, for whatever reason, not married to each other but living as if they were.

It further concerns the Court that to not terminate the parental rights in this matter would mean placing those children back into the chaos they were rescued from. Both [Mother] and [Father] seem to have failed their children in every opportunity they have had to take care of them or to change their own circumstances. This Court is a little worn out with people who say if the government had only done this or that, we would have done better, or I did what they told me to do. I do not see any evidence today that [Mother] and [Father] can make it [on] their own quite frankly. Those of you who have seen me in hearings like this know that I believe extremely strongly in parental rights. I think the evidence should be very, very strong when you are talking about taking away someone's parental rights forever. However, I find that the evidence in this case is clear and convincing that the best interests of these children, their right to be safe, have a safe and sane childhood outweighs the parental rights the parents would otherwise have.

The children deserve the chance to have safe, drug free adoptive homes. The children have adjusted to foster care and have thrived in their foster homes. The children are no longer exposed to drugs. The children are no longer living in chaos. The children have homes that are stable and secure and desire to adopt them. While I do wish I had seen more evidence of the places where the children are now so I could say with greater certainty that these are good places for them to be right now, the Court does not question that they are, and certainly there has been no proof offered that they are not. The Court finds that to trade the stability that the children are now experiencing for the chaotic and apparently toxic relationship between [Mother] and [Father], which the Court feels still exists, would be extremely cruel, and this Court declines to do that.

Mother and Father timely appealed to this Court.

-8-

## Discussion

Although not stated exactly as such, Mother raises the following issue on appeal: whether the Trial Court erred in finding that termination of her parental rights is in the Children's best interest. Similarly, Father raises the issue of whether the Trial Court erred in finding that termination of his parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[5] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-

---

[5] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[6] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d

---

[6] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[7] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

---

[7] Tenn. Code Ann. § 36-1-113(i).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Mother and Father both concede that the ground of severe child abuse was proven against them. Nevertheless, the Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, despite Mother's and Father's concessions, we will review the sole ground for termination found against both of them—that of severe child abuse.

On April 13, 2022, when DCS filed its petition, the relevant ground for termination read as follows: "The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]" Tenn. Code Ann. § 36-1-113(g)(4)

(West July 1, 2021 to June 30, 2022). A prior finding of severe child abuse by a juvenile court in dependency and neglect proceedings can be *res judicata* in later parental rights termination proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In those cases, the doctrine of *res judicata* prevents a parent from re-litigating whether he or she committed severe child abuse. *Id.*

In September 2020, the Juvenile Court found in the course of the dependency and neglect proceedings that C.O., R.V., K.O., and A.V. were severely abused by Mother and Father, pursuant to Tenn. Code Ann. § 37-1-102(b)(27)(E). Mother and Father were parties to those dependency and neglect proceedings. Neither Mother nor Father appealed the finding of severe child abuse. Therefore, the Juvenile Court's prior finding of severe child abuse was *res judicata* and sufficient to establish the ground for termination of parental rights found at Tenn. Code Ann. § 36-1-113(g)(4) against both Mother and Father. We find, as did the Trial Court, that the ground of severe child abuse was proven against Mother and Father by clear and convincing evidence.

We next address whether the Trial Court erred in finding that termination of Mother's and Father's parental rights is in the Children's best interest. On April 13, 2022, when DCS filed its petition, the statutory best interest factors read as follows:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:
> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;
> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2021 to June 30, 2022).[8]

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of

---

[8] In his brief, Father cites to a prior version of the factors, which is inapplicable here.

statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Both Mother and Father challenge the adequacy of the Trial Court's best interest analysis, observing that the Trial Court failed to address a number of statutory factors. Mother points specifically to factors (D), (E), and (K), implicating whether the parent and child have a healthy attachment, whether the parent has maintained regular visitation, and whether the parent has taken advantage of available programs respectively. She argues further that there was no evidence to support the Trial Court's finding that the Children are "thriving" in foster care. In addition, she says that DCS failed to set up a psychological evaluation that might have assisted her parenting skills. According to Mother, she was not given enough time with the Children. Continuing her argument, Mother says that the Trial Court failed to give the Children individualized attention, instead lumping them all together without regard to their specific circumstances. Mother says further that there was no expert proof as to the Children's mental health or wellbeing.

For his part, Father also takes issue with what he contends was the Trial Court's failure to consider all of the statutory factors. He states that the Trial Court's best interest analysis as to him was based largely on Mother's incarceration and a finding that the Children's prospective adoptive homes are fit. Leaning heavily on his own testimony from trial, Father points to his participation in services; that he never missed a visit and sought more visits; that DCS wrongly told him not to speak Spanish to the Children; that he has a meaningful relationship with the Children; that he has a suitable residence; that he had been off drugs for a year and a half; and finally, that his mental health is "perfect."

In response, DCS argues that while a trial court is required to consider all of the best interest factors, it does not have to make a written finding for each of them. Indeed, we have not required that trial courts necessarily spell out each best interest factor by letter so long as it is clear they have considered all of the factors and made sufficient findings as to the relevant factors. *See In re Klowii W.*, No. E2022-01789-COA-R3-PT, 2023 WL

3644502, at *17 (Tenn. Ct. App. May 25, 2023), *no appl. perm. appeal filed* ("Although the Juvenile Court did not identify each factor by letter, it is clear from the Juvenile Court's order that it considered the applicable best interest factors.").[9]  In any case, DCS argues that the Trial Court properly found that termination was in the Children's best interest based on factors A, B, C, J, and M.

While the portion of the Trial Court's termination order allotted for the best interest analysis is fairly limited in its discussion, the findings of fact section of the order contains more detailed findings.  There, the Trial Court addressed essentially all of the other factors Mother and Father say were overlooked.  For example, the Trial Court acknowledged that both Mother and Father participated in visitation throughout the case.  Even still, the Trial Court noted Haynes' testimony about how the parents did not pay sufficient attention to all of the Children.  It also noted that neither parent progressed to unsupervised visitation.  On the matter of services, the Trial Court found that neither parent successfully or fully participated in services with DCS.  This is especially significant given that the case stems largely from the Children's exposure to drugs in Mother's and Father's home.  Mother and Father successfully addressing their substance abuse problems was of central importance in this case involving severe child abuse.  To the extent that Mother and Father refrained from using drugs over the last year or year and a half before trial, that was commendable but tardy.  Moreover, the Trial Court, at least implicitly, did not credit Mother's and Father's testimony as to their changed circumstances, which was its prerogative.

With respect to Mother's argument that there was no evidence to support the Trial Court's finding that the Children were thriving in foster care, Haynes testified that the Children had undergone counseling and that most of the Children do not ask about their parents outside of visits.  While perhaps "thriving" was excessive based on this evidence, there was at least some evidence from which to conclude that the Children's psychological needs are being met.  As for DCS's alleged lack of efforts, there is no hint in the record that, but for DCS taking a more active line with Mother, she would have been more cooperative with social services.  Mother incurred arrests, spent time in jail, and was discharged out of rehabilitation for breaking the rules.  Regrettably, she set herself back multiple times.  As to Mother's argument that the Trial Court's best interest analysis lacks specificity as to each of the Children individually, we do not agree that this constituted reversible error.  All of the Children without distinction stand to be harmed if they face the prospect of once more being exposed to drugs like methamphetamine.  While Mother argues that there was no expert proof as to the Children's mental health or wellbeing, Tenn. Code Ann. § 36-1-113(i)(2) states that "[e]xpert testimony is not required to prove or disprove any factor by any party."

---

[9] To be sure though, the better and safer practice for trial courts, in order to avoid undue delay and remand, is to make findings for each best interest factor, whether it weighs in favor of termination, against termination, or is neutral.

Father's argument is geared toward his consistent visitation, his home, his job, and his efforts at recovery. We reiterate that the Trial Court was not required to credit Father's testimony about his various stated improvements. Father's testimony was not overly credible on its face. His testimony that his brother might have stolen his identity to pin a DUI charge on him was strange to say the least, for one thing. At any rate, the Trial Court was unwilling to accept Father's word as a substitute for Father's successful completion of services or other substantive demonstrations of his fitness to parent. Even still, drug use was not the only concern with Father—there were concerns about domestic violence and alcohol abuse. The Trial Court had ample basis to conclude that preserving the possibility of returning the Children to Father's care, thus leaving them in limbo to an uncertain future, was not in their best interest.

While the Trial Court's order is not a model of organization, it made findings corresponding to the relevant and applicable best interest factors. The evidence does not preponderate against the Trial Court's findings. We find by clear and convincing evidence, as did the Trial Court, that termination of Mother's and Father's parental rights is in the Children's best interest.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, Kristie C. and Jose O., and their surety if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-18-